# District of Columbia
# Court of Appeals

**No. 16-FM-1153**

J.U.,

Appellant,



FILED

JAN. 4, 2018

DISTRICT OF COLUMBIA
COURT OF APPEALS

v.                                    **DRB-3166-16**

J.C.P.C.

Appellee.

Appeal from the Superior Court of the
District of Columbia

BEFORE: Fisher and Beckwith, Associate Judges, and Steadman, Senior Judge.

**J U D G M E N T**

This case was submitted to the court on the transcript of record, the briefs filed, and without presentation of oral argument. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the trial court's order of October 31, 2016, is vacated and the case is remanded to enter an amended order that includes the requisite SIJ status finding that C.J.P.U.'s reunification with his father is not viable due to abandonment under District of Columbia law.

For the Court:

*Julio A. Castillo*

JULIO A. CASTILLO
Clerk of the Court

Dated: January 4, 2018.

Opinion by Senior Judge John M. Steadman.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-FM-1153

J.U., APPELLANT,

v.

J.C.P.C., APPELLEE.

FILED 01/04/2018
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court of the
District of Columbia
(DRB-3166-16)

(Hon. Hiram E. Puig-Lugo, Trial Judge)

(Submitted November 20, 2017          Decided January 4, 2018)

*Evgenia V. Sorokina* was on the brief for appellant.

Before FISHER and BECKWITH, *Associate Judges*, and STEADMAN, *Senior Judge*.

STEADMAN, *Senior Judge*: C.J.P.U., the minor at the heart of this appeal, illegally entered this country in 2015 as an unaccompanied fourteen-year-old teenager from El Salvador to join his mother ("J.U." or "appellant"), who has been living here since 2005.[1] He seeks to remain in this country as a juvenile qualified

---

[1] As is customary in appeals involving juvenile matters, we use here the initials of the minor and the parties.

for "special immigrant juvenile" status ("SIJ"). Among other requirements, to achieve this status a juvenile court must find that "reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law." 8 U.S.C. § 1101 (a)(27)(J) (2009 Supp. II). The issue before us is whether the trial court erred in refusing to make such a finding with respect to C.J.P.U.'s father ("J.C.P.C." or "appellee"), who remains in El Salvador. We agree with the mother that, on the record before us, such a finding is mandated.

## I.    The SIJ Status Statute[2]

Under the immigration laws of the United States, an immigrant juvenile, or someone acting on their behalf, may petition for SIJ status. As originally enacted in 1990, the statute required a finding that a juvenile applicant was "eligible for long-term foster care," 8 U.S.C. § 1101 (a)(27)(J) (1998 Supp. III), thus effectively limiting the status to juveniles who had no parent to care for them.

---

[2] A further description of SIJ status can be found in a number of sources. *See e.g.*, Cristina Ritchie Cooper, *A Guide for State Court Judges and Lawyers on Special Immigrant Juvenile Status*, 36 No. 2 CHILD L. PRAC. 25 (March/April 2017); 3 Charles Gordon *et al.*, *Immigration Law and Procedure* § 35.09 (Matthew Bender rev. ed. 2015).

In 2008, the provision was revised and expanded and now reads as follows:

> [a special immigrant juvenile is] an immigrant who is present in the United States – (i) who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States, and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law; (ii) for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence; and (iii) in whose case the Secretary of Homeland Security consents to the grant of special immigrant juvenile status[.]

8 U.S.C. § 1101 (a)(27)(J)(i)-(iii). The current law also requires the applicant be under twenty-one years of age and unmarried. *See* 8 C.F.R. § 204.11 (c)(1), (2).[3] Notably for present purposes, "long-term foster care" was replaced with the requirement that reunification not be viable with "[one] or both" parents due to abuse, neglect, or abandonment, significantly broadening eligibility for SIJ status.

---

[3] The federal regulations have not been updated to reflect the 2008 statutory amendments to the SIJ status statute.

Now, an SIJ applicant need not be in foster care or the child welfare system to be eligible. A finding is sufficient for SIJ status if reunification with only one parent is not viable due to abuse, neglect, or abandonment, at least where, as here, the parent in question is located in the home country to which the minor would otherwise be deported.[4]

Such an interpretation is consistent not only with our reading of the statute, but also with the legislative history and, importantly, the interpretation of the United States Citizenship and Immigration Service ("USCIS"), the agency tasked with administering SIJ status approvals. The USCIS Policy Manual notes that "USCIS interprets the TVPRA changes as a clarification that petitioners do not need to be eligible for or placed in foster care and that they may be reunified with one parent or other family members." *USCIS Policy Manual*, Vol. 6, Part J, Ch. 2, § D2 n.9 (current as of Aug. 23, 2017), https://www.uscis.gov/policymanual/HTML/PolicyManual-Volume6-PartJ-Chapter2.html. The states of New York and California have similarly interpreted

---

[4] Although the statute may not be entirely clear, it is well-established that the juvenile court is required to make a finding on the viability of reunification as well as neglect, abuse, or abandonment. *See USCIS Policy Manual*, Vol. 6, Part J, Ch. 2, § D2 ("The juvenile court must find that reunification with one or both parents is not viable due to abuse, neglect, abandonment, or a similar basis under the relevant state child welfare laws.").

the statutory language. *See In re Israel O.*, 182 Cal. Rptr. 3d 548, 555 (Cal. Ct. App. 2015) (holding that although the "one or both" language is ambiguous, the intent of the statute and USCIS's unofficial guidance makes clear that "SIJ eligible children . . . may be living in this country with . . . the non-abusive parent") (internal quotation marks and citation omitted) (emphasis omitted); *In re Marcelina M.-G. v. Israel S.*, 973 N.Y.S.2d 714, 722 (N.Y. App. Div. 2013) (finding that the "one or both" parent language "signifies that the child need not be separated from both parents to be eligible for [SIJ status]") (citation omitted).[5]

These requisite state court findings, however, are not determinative of SIJ status. Rather, once a state juvenile court makes the requisite SIJ status findings, the minor must file a Petition for Special Immigrant Status with USCIS under the Department of Homeland Security ("DHS") that includes a copy of the juvenile court's findings. In addition to the petition and requisite findings, the minor must obtain the consent of USCIS. *See* 8 U.S.C. § 1101 (a)(27)(iii). For the SIJ applicant to obtain USCIS's consent, USCIS must review the juvenile court order,

---

[5] The Nebraska Supreme Court has found that the "[one] or both" parent language requires a minor to demonstrate it is not feasible for the minor to return to either parent. *In re Erick M.*, 820 N.W.2d 639, 647 (Neb. 2012). This ruling precedes the issuance of the USCIS Policy Manual and both the New York and California cases.

conclude that the SIJ status request is bona fide, and approve the petition. *Id.* Accordingly, the ultimate decision as to a minor's SIJ status lies with the federal government, not with the juvenile court.[6] Once SIJ status is approved, the minor can apply for legal permanent residence.

## II.    The Current Litigation

The case before us began when the mother filed a verified complaint for custody in the Superior Court seeking sole legal and physical custody of C.J.P.U., as well as a Motion for Special Immigrant Juvenile Status Predicate Order. In the mother's request for findings of C.J.P.U.'s SIJ status eligibility, she alleged reunification with the father was not viable because he had abandoned C.J.P.U. The father filed a Consent Answer to both the Complaint for Custody and Motion for SIJ status findings under penalty of perjury. In his answer, the father agreed with all the allegations made by the mother in her complaint and SIJ status motion.

---

[6] The unusual involvement of state courts in what is ultimately a federal immigration decision appears based on the belief that state courts have greater experience in determining matters of abuse, neglect, and abandonment. While the ultimate decision for SIJ status is with the federal government, it might be observed that the refusal by a juvenile court to make a requisite finding can have the effect of leaving the minor open to deportation, thus making it a significant decision in itself. In C.J.P.U.'s case, a removal proceeding is already underway.

He also agreed with both the mother's and C.J.P.U.'s sworn statements in support of the SIJ status motion.

After a hearing at which both the mother and C.J.P.U. testified, the trial court granted the mother sole physical and legal custody of C.J.P.U. With respect to the request for SIJ status findings, the trial court determined that C.J.P.U. satisfied the following conditions imposed by the statute: (1) C.J.P.U. was under the age of twenty-one years and unmarried; (2) C.J.P.U. was placed, pursuant to an order of the juvenile court, in the custody of his mother when the court granted her sole legal and physical custody; and (3) it was not in C.J.P.U.'s best interest to be returned to El Salvador.[7] The trial court, however, found C.J.P.U. failed to meet the final condition required for SIJ status eligibility: that reunification with his father was not viable due to abandonment or neglect. Challenging this conclusion, the mother brought the appeal now before us.

---

[7] In making this last finding, the trial court said: "C.J.P.U. has never lived full-time with his father. C.J.P.U.'s paternal grandfather, his caretaker for nearly ten years, is deceased. His mother, who has consistently provided for him, is in the United States, as are his three older and one younger sibling. C.J.P.U.'s mother is able to provide care, a home, food, clothing, and the opportunity to attend school full time."

In addressing this finding, it is important to focus on exactly what is to be determined in the context of the case before us.  It is not the abstract question whether the minor has been neglected or abandoned by the father.  Rather, it is whether reunification with the father in El Salvador is "viable" due to "abandonment."  It calls for a realistic look at the facts on the ground in the country of origin and a consideration of the entire history of the relationship between the minor and the parent in the foreign country.

Apart from its primary meaning of capacity for life, the word "viable," as it applies to the situation here, has been defined in various ways, but all of them carry the connotation of common-sense practical workability.  *See e.g.*, *Merriam-Webster New International Dictionary* (3d ed. 2002) ("capable of being put into practice: workable); *American Heritage Dictionary of the English Language* (3d ed. 1992) ("capable of success or continuing effectiveness; practicable"); *Random House Dictionary of the English Language* (21st ed. 1987) ("practicable; workable").

In its turn, the word "abandonment" in our law is found in several definitions, depending on the context in which the determination is being made. Thus, where a petition alleges abandonment as grounds for a neglect finding, D.C.

Code § 16-2316 (d)(1)(C) (2012 Repl.) provides that an inference of neglect may be drawn if the child's parent "is known but has abandoned the child in that he or she has made no reasonable effort to maintain a parental relationship with the child for a period of at least four (4) months." On the other hand, in a termination/adoption proceeding, the statute prescribes that when a parent "has abandoned the prospective adoptee and voluntarily failed to contribute to his support for a period of at least six months," his or her parental rights may be terminated without the required consent. D.C. Code § 16-304 (d) (2012 Repl.).[8] And for purposes of uniform child-custody jurisdiction and enforcement, abandonment is defined simply as "left without provision for reasonable and necessary care or supervision." D.C. Code § 16-4601.01 (1) (2012 Repl.). Here, the concept of abandonment is being considered not to deprive a parent of custody or to terminate parental rights but rather to assess the impact of the history of the parent's past conduct on the viability, *i.e.*, the workability or practicability of a forced reunification of parent with minor, if the minor were to be returned to the home country.

---

[8] The USCIS Policy Manual is explicit that termination of parental rights is not required. *See USCIS Policy Manual*, Vol. 6, Part J, Ch. 2, § D2 "([a]ctual termination of parental rights is not required").

We turn to consider the record in this appeal in light of the SIJ status statute and the above legal principles relating to the specific inquiry before us.[9]

### III.   "Viable Reunification" and "Abandonment"

C.J.P.U. was born on September 22, 2000, in El Salvador.  During the early part of his life, C.J.P.U. resided with his mother, siblings, and maternal grandmother.  His father lived with C.J.P.U.'s paternal grandparents a short distance away and spent several days a week with C.J.P.U. and the mother at the maternal grandmother's home.  During this period of C.J.P.U.'s life, his mother and father had two additional children, both also born in El Salvador, but never married.

---

[9]   The statutory structure may impose an extraordinarily difficult task on a juvenile court, as in the present case.  The problems in developing a proper evidentiary record are obvious.  The father has acquiesced in all the assertions made by the mother and C.J.P.U.  There is no adverse party to present contrary evidence based on happenings in the home country.  A court may discredit evidence, but creation of contrary evidence rests on surmise.  The possibility of collusion is not to be discounted, but the filings in the court are all made under penalty of perjury and would appear to have some presumptive validity.  It is the responsibility of USCIS, not the juvenile court, to determine whether the SIJ status request is "bona fide."  *See* 8 U.S.C. § 1101 (a)(27)(J)(iii).

In 2005, the mother moved to the United States where she has since resided with four of C.J.P.U.'s siblings and his niece.[10] Prior to moving to the United States she arranged for C.J.P.U. and his younger brother to reside with their paternal grandparents. The mother also arranged for C.J.P.U.'s younger sister to reside with the children's maternal grandmother. After the mother's departure, the father created a second family and had a daughter with his new partner, moving half a block away from the paternal grandparents' home. In the years C.J.P.U. and his mother lived apart, she provided approximately $200-$300 monthly to C.J.P.U.'s paternal grandfather and spoke on the telephone with C.J.P.U. weekly. In October 2013, C.J.P.U.'s paternal grandfather passed away, apparently causing controversy between C.J.P.U. and the other relatives in the home about whether he should be permitted to continue living there. In any event, as the trial court explicitly noted, C.J.P.U. has never lived full-time with his father.

During this period, by the testimony of the mother and C.J.P.U., the father living apart from his son was a non-supportive and distant figure. While the father did visit the paternal grandparents' house on a regular basis, C.J.P.U. testified that the father never fed him, gave him clothes, took him to school, cared for him when

---

[10] The record does not reveal the mother's exact status in this country or that of the children.

he was sick, or showed him any affection. Rather, he thought of the paternal grandfather as his father and had no feelings of affection towards his biological father. The father never invited C.J.P.U. to live with him even after discovering that C.J.P.U. had nowhere to live in El Salvador,[11] nor did the father ever provide any financial support or assume any significant parental responsibility for making necessary day-to-day decisions regarding C.J.P.U. All financial support came from his mother and grandfather. Likewise, the sworn Complaint and affidavit of the mother, with which the father expressly agreed, averred that, while the father recognized C.J.P.U. as his son, he never helped the mother to financially care for him or helped to take care of him, and that the father does not have a parent-child relationship with C.J.P.U. as he has never participated in his life or shown him love. Once C.J.P.U. entered the United States and took up residence with his mother, C.J.P.U. testified he had never had any contact with his father and that the last contact with his father was a week before he left El Salvador. This was so even though the mother and the father did communicate by telephone on certain

---

[11] The trial court noted that the mother "did not present any credible evidence to suggest that [the father] had ever been asked to take care of [C.J.P.U.] or to provide for him." However, it made no findings as to whether the father had ever taken the initiative to parent C.J.P.U. A parent's role is not fulfilled in passivity.

occasions, one of which involved getting a passport for C.J.P.U. During the years that the mother and son were apart, they communicated by telephone every week.

Although there was no explicit contrary evidence, the trial court was of the view that the mother and C.J.P.U. were "minimizing" the father's involvement in C.J.P.U.'s life. It discredited C.J.P.U.'s testimony that the father visited only to ask for money and ignored both C.J.P.U. and his younger brother on visits to the grandparents' home, surmising that it was simply not credible that a father could visit his parents' home and yet completely ignore his two sons who lived there. The trial court also pointed out several instances in the record of the father's concern over his son's welfare: when the father found out that a teacher had struck C.J.P.U. for not doing homework, the father confronted the teacher; when C.J.P.U. was preparing to leave for the United States, the father went to say goodbye and wish him luck; and the father signed paperwork for C.J.P.U. to obtain a passport once in the United States as well as a consent to the custody petition. With respect to the failure of the father to contact C.J.P.U. after his arrival in the United States, the trial court simply noted that C.J.P.U. had testified that the father did not know his phone number or address in the United States. The trial court in short concluded that the father may "not have been a perfect father, but he has not been a neglectful one either."

We think, however, the trial court applied too demanding a standard of both "viability" and "abandonment" in the context of this particular case. As far as the record shows, the father, while perhaps not without affection for his son and taking spasmodic steps in his parental role, nonetheless over the years never provided a home with father and son together, never exercised the day-to-day oversight with parental decisions incumbent upon proper care and supervision, never contributed financially to maintenance of his son, and essentially outsourced all these duties to others. *Cf. In re Je.A.*, 793 A.2d 447, 448 (D.C. 2002) (finding the mother abandoned her child where "[f]or over a year and a half, . . . [the mother] made no effort to assume any parental responsibility [for] or establish any parental relationship with [the child]," and had "taken no action to provide for the physical and emotional needs of [the child]"); *Petition of C.E.H.*, 391 A.2d 1370, 1373-74 (D.C. 1978) (finding abandonment as grounds for termination where the mother "never cleaned her child or cooked a meal for her," and "never assumed responsibility for [the child's] religious, moral and educational training" but left those parental responsibilities to the foster parents). Even after the grandfather died, and living arrangements with C.J.P.U. apparently became untenable for the

aging grandmothers,[12] the father simply acquiesced in C.J.P.U.'s departure to join his mother. Moreover, he never communicated with his son after his departure, for which the absence of telephone number or address would not have presented an insuperable obstacle to a caring parent.

At bottom, what is at issue here is not "reunification" with the father but rather initial "unification" itself. We must conclude that sending a seventeen-year-old boy back to the care of a father who has never fulfilled any day-to-day role in the support, care, and supervision during the boy's lifetime cannot be a "reunification" that is "viable," that is, "practicable; workable," and such a conclusion is due to "abandonment" evidenced by the record here in its relation to the viability of reunification. Given the flexibility of the concept depending on the context for which the determination is being made, here abandonment is judged by

---

[12]    Both of C.J.P.U.'s younger siblings still live with the respective grandmothers in El Salvador, not with their father. The trial court observed that each grandmother was in charge of one of the younger siblings of C.J.P.U. and that it was highly unlikely that the mother would have allowed these children to remain with a grandmother who did not provide appropriate care. It does not follow, however, that either would be in a position to care for an additional child, especially an older teenager, to house, feed, and supervise. To the contrary, the mother's sworn statement was quite specific in averring that after the paternal grandfather died, the remaining family members did not want C.J.P.U. to live with them and that the maternal grandmother was unable to care for him, because of her physical condition already caring for the mother's daughter. In any event, the statutory inquiry is not forced reunification with a grandparent, but with the father.

the lifelong history of C.J.P.U. with his father and the bearing of that history on the prospects if C.J.P.U. were to be returned to the immediate custody of the father in the home country.

In reaching this conclusion, we generally follow the approach in our only known prior case addressing the issue now before us. Though not binding precedent in that no published opinion has been issued, in *Olmedo v. Lopez-Portillo*, No. 16-FM-1103 (Nov. 9, 2016), this court addressed an appeal from a trial court denial of SIJ status involving the same issue as in our case.[13] Prior to arriving in the United States at the age of sixteen to live with his uncle, the minor in that case had resided his entire life with his biological mother in El Salvador. While there, he and his mother were threatened with physical harm by local gangs, they had moved from their original home to escape the threats, and were followed by the gangs. The mother then moved yet again, telling the minor to leave for the United States, which he did alone. The mother had not provided support since telling the minor to leave and is unable to do so. If the minor returned to El Salvador, he would not be permitted to live with the mother. We concluded that,

---

[13] The only case in our jurisdiction with a published opinion involving the SIJ status statute is *In re C.G.H.*, 75 A.3d 166 (D.C. 2013), but that case dealt with a different provision of the statute.

as a matter of law, the mother neglected and abandoned the minor and that reunification was not viable.[14]

We vacate the October 31, 2016, order appealed from and remand this case to the trial court to enter an amended order consistent with this opinion that includes the requisite SIJ status finding that C.J.P.U.'s reunification with his father is not viable due to abandonment under District of Columbia law.

*So ordered.*

---

[14] This decision post-dated the trial court's ruling in our case. Based on this decision, the mother in our case filed a motion under Super. Ct. Civ. R. 60 (b)(6) for reconsideration of the trial court's denial of her motion for SIJ status findings. The trial court declined to address this motion on the ground that the filing of the notice of appeal from its original order deprived it of jurisdiction.