*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-FM-61

B.R.L.F., APPELLANT,

V.

LILIAN MARLENY SARCENO ZUNIGA, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(DRB-3211-16)

(Hon. Hiram E. Puig-Lugo, Trial Judge)

(Submitted January 9, 2018                          Decided January 2, 2019)[*]

*Jaime Winthuysen Aparisi* was on the brief for appellant. Zachary Kohn entered his appearance for appellant.

No brief was filed for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, EASTERLY, *Associate Judge*, and FERREN, *Senior Judge*.

Opinion for the court PER CURIAM.

Concurring opinion by *Associate Judge* EASTERLY at page 17.

_____
[*] The decision in this case was originally issued as an unpublished Memorandum Opinion and Judgment. It is now being published by the court sua sponte after addition of the concurring opinion and opinion concurring in the judgment.

Opinion concurring in the judgment by *Senior Judge* FERREN at page 18.

PER CURIAM:   In December 2015, at age fourteen, B.E.L.S. entered the United States illegally from Guatemala in the company of human smugglers to join appellant, his father, who has resided in the United States since 2007.  Appellant challenges the trial court's December 22, 2016, order denying his unopposed motion for findings pursuant to District of Columbia law that would allow him to petition the United States for Special Immigrant Juvenile Status ("SIJS") for B.E.L.S. under 8 U.S.C. § 1101 (a)(27)(J) (2009 Supp. II).[1]  We agree with the trial

_____

[1]  Section 1101 (a)(27)(J)(i)-(iii) provides in relevant part:

> [A special immigrant juvenile is] an immigrant who is present in the United States—(i) who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States, and *whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law*; (ii) for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence; and (iii) in whose case the Secretary of Homeland Security consents to the grant of special immigrant juvenile status[.]

(emphasis added).

court's findings that B.E.L.S. was eligible for SIJS, and that it would not be in B.E.L.S.'s "best interest to be returned" to Guatemala.[2]  We discern reversible error, however, in the court's finding that B.E.L.S.'s reunification with his mother in Guatemala would be "viable."[3]  Accordingly, we reverse and remand the case for the trial court to enter judgment that B.E.L.S. qualifies to petition for SIJ status.

## I.  The Facts

In November 2015, B.E.L.S.'s mother placed him in the company of human smugglers, who took him to the United States border, where he crossed into Texas in December and was "caught" by immigration enforcement.  The terms of his release are not clear, but by January 2016, he had arrived in Washington, D.C. to live with appellant.

B.E.L.S. testified that he "came to the United States" for "better opportunities to study."  He added that on two occasions prior to his departure gang members had asked him to "sell cocaine and marijuana," and that he had

---

[2] *Id.*

[3] *Id.*

feared they "would harm" or even "kill" him because of his refusal to do so. B.E.L.S. and appellant both stated that the boy's mother had sent him away with human smugglers because she believed that "the police would not do anything" about the gang threat.[4]  B.E.L.S. testified that his run-ins with gang members had occurred first in September 2014 and again in October 2015, thirteen months after the first approach and one month before he left home.

As to his home life, B.E.L.S. testified that he had lived with his mother and two of his younger siblings in Guatemala.  Appellant and B.E.L.S. both testified that, although his mother "always is sick" and is therefore unemployed, appellant supported the family when B.E.L.S. was in Guatemala, supports B.E.L.S. now, and continues to support B.E.L.S.'s mother and siblings living with her in Guatemala. B.E.L.S. presently keeps in touch with his mother through weekly phone calls.

## II.  The Trial Court's Ruling

The trial court ruled that B.E.L.S. had satisfied three of the four statutory

_____

[4]  B.E.L.S. specifically stated that his mother had refused to enlist help from the police "because [they] were turn coats and they would [s]ell themselves for money."

and regulatory criteria allocated by federal law to the District of Columbia Courts for making SIJS findings: (1) B.E.L.S. was under the age of twenty-one years and unmarried at the time of his request;[5] (2) B.E.L.S. had been placed, pursuant to a concurrent order of the court, in the sole legal and physical custody of his father in the District of Columbia,[6] with "a reasonable right of visitation" for his mother "per agreement between" her and appellant; and (3) it was not in B.E.L.S.'s "best interest" to be returned to Guatemala.[7] The trial court also ruled, however, that there was "no credible evidence that reunification with BELS's mother is not viable," thereby rejecting the petition for SIJS findings under 8 U.S.C. § 1101 (a)(27)(J)(i).[8] The court offered several reasons for this conclusion.

As to B.E.L.S.'s family life, the trial court found no credible evidence that "his mother abused, neglected or abandoned BELS in Guatemala before [she] sent him to live with his father in the United States." The court also noted that "BELS and his mother have maintained a parent-child relationship since his arrival in this country"; indeed, "[t]hey converse on the telephone every Saturday." Furthermore,

_____

[5] 8 C.F.R. § 204.11 (c)(1)-(2) (implementing SIJS statute, *supra* note 1).

[6] *See* 8 U.S.C. § 1101 (a)(27)(J)(i), *supra* note 1.

[7] *See* 8 U.S.C. § 1101 (a)(27)(J)(ii), *supra* note 1.

[8] See *supra* note 1.

said the court, the mother's health "does not make it impossible" for her to care for B.E.L.S., as "she is currently caring for two of [his] siblings despite her reported health concerns." Nor did the court find any "reason to believe that she would be unable to care for" B.E.L.S., as appellant continues to provide financial support for her and B.E.L.S.'s two siblings remaining in Guatemala in their mother's care.

Despite this benign view of B.E.L.S.'s past and future home life with his mother, the trial court found that it was not in B.E.L.S.'s "best interest to return to Guatemala" because B.E.L.S. would have "better employment and educational opportunities" in the United States as well as "a better quality of life . . . distant from the public safety concerns in Guatemala." This "best interest" finding was obvious to the court, despite its finding that B.E.L.S. had not lived under the gang threat in Guatemala that he allegedly feared.[9]

_____

[9] Primarily because "nothing happened" to B.E.L.S. during the thirteen months between the two alleged gang threats, the court disbelieved B.E.L.S.'s testimony that "gang members [had] threatened BELS before he left Guatemala" or would "threaten BELS should he return to Guatemala." Indeed, the court perceived that B.E.L.S. had "embellished" his gang threat testimony. When asked by counsel if he knew what gang had approached him, B.E.L.S. initially replied, "No, they never told me." When he was then asked how he knew they were gang members, he responded, "Because they have tattoos on them," from "the 18th" Street Gang. By B.E.L.S. first denying he knew the name of the gang, then naming it upon further questioning by his lawyer, the trial court apparently believed that the boy was responding to coaching. Later, on redirect examination, in response to

(continued . . . )

The trial court addressed—and rejected—the alleged gang threats exclusively in connection with its analysis of B.E.L.S.'s "best interest";[10] the court did not reference Guatemalan gangs when ruling on appellant's claims of "neglect" and "abandonment" by the boy's mother premised on her entrusting him to human smugglers.[11] These latter claims, however, were premised on B.E.L.S.'s gang threat testimony and the mother's response, and this appeal challenges the trial court's failure to address that alleged connection.

### III. Appellant's Argument

Appellant contends that reunification of B.E.L.S. with his mother would not

_____

( . . . continued)

counsel's question why B.E.L.S. believed that the gang members would harm him, he first replied, "Because that's what they were telling me." When counsel followed by asking B.E.L.S. whether they had "guns" ("No") or "weapons," he said that they had "Knives"—another answer the court believed was an embellishment triggered by a leading question from B.E.L.S.'s counsel.

The foregoing finding that a gang had not threatened B.E.L.S. seems more than a little strained, but because B.E.L.S appeared personally before the court and we have no more than the written record to scrutinize, we cannot say that the trial court's finding was clearly erroneous. *See, e.g.*, *In re J.C.F.*, 73 A.3d 1007, 1012-13 (D.C. 2013).

[10] 8 U.S.C. § 1101 (a)(27)(J)(ii), *supra* note 1.

[11] 8 U.S.C. § 1101 (a)(27)(J)(i), *supra* note 1.

be viable because she has "neglected" and "abandoned" him according to District of Columbia law (applicable as "State" law incorporated into the SIJS statute).[12] Specifically, "by sending [B.E.L.S.] away" with "an unknown human smuggler," his mother has failed "to take care of him" (neglect) and to maintain "their relationship" (abandonment). She ignored "safer alternatives" to remove B.E.L.S. from the alleged gang threat, such as contacting the police or relocating B.E.L.S. "internally" (in Guatemala) with the money she used to hire the smuggler. Nor did she attempt to find a trusted adult to accompany and protect B.E.LS. on the journey. In any event, adds appellant, B.E.L.S.'s mother is "unable to care for him as she is ill and unemployed." Accordingly, argues appellant, B.E.L.S.'s reunification with his mother "is not viable because of abandonment and neglect" —grounds which, he says, the trial court erroneously rejected.

## IV. Analysis

### A. Standard of Review

We review "the trial court's decisions on appeal for abuse of discretion, errors of law, and clear lack of evidentiary support. In reviewing for abuse of

---

[12] See *supra* note 1.

discretion, this court considers whether the trial court exercised its discretion within the range of permissible alternatives, based on all relevant factors and no improper factor."[13] We review the trial court's legal determinations de novo and its "findings of fact . . . for clear error."[14] Overall, the decision of the trial court "must provide substantial reasoning that is based on correct legal principles and has a firm factual foundation in the record."[15]

## B. SIJS Standard of Proof

The SIJS statute does not announce a federal standard of proof,[16] and "[t]here is nothing in" the U.S. Citizenship and Immigration Services ("USCIS") "guidance that should be construed as instructing juvenile courts on how to apply their own state law."[17] Because our trial courts, unless otherwise specified,

---

[13] *In re J.O.*, 176 A.3d 144, 153 (D.C. 2018) (citation and internal quotation marks omitted).

[14] *Id.*; *see* D.C. Code § 17-305 (a) (2012 Repl.); *E.P.L. v. J.L.-A.*, 190 A.3d 1002, 1006 (D.C. 2018).

[15] *In re J.O.*, 176 A.3d at 153 (internal quotation marks omitted).

[16] *See generally J.U.*, 176 A.3d at 140-41 (looking to District abuse and neglect statutes for guidance).

[17] *USCIS Policy Manual*, Vol. 6, Pt. J, Ch. 2 (D)(4) (Dec. 12, 2018), https://www.uscis.gov/policymanual/HTML/PolicyManual-Volume6-PartJ-

(continued . . . )

generally apply the preponderance standard in civil cases,[18] including family matters,[19] we conclude that the SIJS statute required appellant to demonstrate by a preponderance of the evidence that B.E.L.S.'s reunification with his mother was "not viable" under District of Columbia law.[20]

## C. This Case

After hearing testimony from both father and child (appellant and B.E.L.S.),

_____

( . . . continued)
Chapter2.html.

[18] *In re E.D.R.*, 772 A.2d 1156, 1159 (D.C. 2001) ("[I]n most civil cases this court requires only a preponderance of the evidence as the standard of proof.").

[19] *See, e.g.*, D.C. Code §§ 16-914 (f)(2) (2012 Repl.) (establishing "preponderance of the evidence" standard for proceedings between parents to modify custody), -2317 (b)(2) & (c)(2) (2012 Repl.) (establishing "preponderance of the evidence" standard for child neglect proceedings); *In re P.B.*, 54 A.3d 660, 665-66 (D.C. 2012) (applying "preponderance of the evidence" standard to child neglect proceeding).

[20] We recognize situations in which the court must establish that a child was abused, neglected, or abandoned by "clear and convincing evidence." D.C. Code §§ 16-831.06(b) (2012 Repl.), -831.07(a) (2012 Repl.) (third-party custody proceeding); *see also In re E.D.R.*, 772 A.2d at 1159 (recognizing clear and convincing standard "when there is a liberty or fundamental interest at stake, such as in cases involving termination of parental rights"); *cf. In re Guaman*, 879 N.W.2d 668, 672-73 (Minn. Ct. App. 2016) (considering need to make SIJS findings under state law framework with a clear and convincing evidence standard.)

the trial court, in adjudicating subsection (i) of the SIJS statute,[21] concluded that B.E.L.S. had presented "no credible evidence . . . that his mother abused, neglected or abandoned [B.E.L.S.] in Guatemala before his mother sent him to live with his father in the United States."[22]  We perceive no record basis for second-guessing the court's findings that B.E.L.S.'s mother had not "abused" him. On the facts here, however, "neglect" and "abandonment" require extended analysis.

### 1. Neglect and Abandonment

The question before us—in aid of an ultimate determination by federal authorities as to whether B.E.L.S. should be allowed to remain in the United States—is whether B.E.L.S.'s mother "neglected" or "abandoned" him by sending him on a long and dangerous journey with human smugglers from Guatemala to the Texas border in the hope of reuniting the boy with his father in the District of Columbia.  We have previously noted the difficulties that such a task imposes upon a state judge.[23]  Such proceedings, as in this case, are normally unopposed and involve factual questions in the home country thousands of miles away.

_____

[21] See *supra* note 1.

[22] Nor did the trial court identify a "similar basis" for mistreatment.

[23] *See J.U.,* 176 A.3d at 141 n.9.

Furthermore, the state court is asked to make the determination in a context quite foreign to its normal responsibilities—indeed, to make a determination informed by the realization that, when refusing to make the findings required for SIJ status, the court's decision is, in effect, a negative immigration decision.

Accordingly, when determining whether a petitioner has established a prima facie case, the trial court must recognize that Congress to some extent has put its proverbial thumb on the scale favoring SIJS status. "The purpose of the law is to permit abused, neglected, or abandoned children to remain in this country."[24] And, in establishing the requirements for SIJS status, Congress knew that there would be proof problems, *i.e.,* "that those seeking the status would have limited abilities to corroborate testimony with additional evidence."[25] For that reason, a trial court's imposition of "insurmountable evidentiary burdens of production or persuasion" on an SIJ petitioner would be "inconsistent with the intent of the Congress."[26] Therefore, in this international—not merely District of Columbia—environment,

_____

[24] *In re Dany G.*, 117 A.3d 650, 655 (Md. Ct. Spec. App. 2015).

[25] *In re J.A.*, 2017 WL 4876779, at *4 (Md. Ct. Spec. App. Oct. 30, 2017) (quoting *In re Dany G.*, 117 A.3d at 655-56).

[26] *Id.* (quoting *In re Dany G.*, 117 A.3d at 655-56); *accord In re Domingo C.L.*, No. 2016-M-02383, 2017 WL 3769419, at *4 (Tenn. Ct. App. Aug. 30, 2017).

all the relevant factors must be understood in the light most favorable to determinations of neglect and abandonment, with an eye to the practicalities of the situation without excessive adherence to standards and interpretations that might normally apply in strictly local contexts.[27]

Under District of Columbia law, a "neglected child" includes a child [1] "who has been abandoned or abused by his or her parent" or [2] "whose parent . . . has failed to make reasonable efforts to prevent the infliction of abuse upon the child."[28]  A court may infer abandonment if a parent "has made no reasonable effort to maintain a parental relationship with the child for a period of at least four (4) months."[29]

In this case, B.E.L.S's mother:  (1) retained a "right of visitation" in her custody agreement with the boy's father; and (2) has regular Saturday phone calls with her son here in the District.  Therefore, if this were a strictly local case in the

_____

[27]  *See Benitez v. Doe*, 193 A.3d 134, 139 (D.C. 2018) ("caution[ing] the trial court[s] against imposing . . . insuperable evidentiary burdens on SIJ status applicants").

[28]  D.C. Code § 16-2301 (9)(A) (2012 Repl.).

[29]  D.C. Code § 16-2316 (d)(1)(C) (2012 Repl.).

District of Columbia, based on these two indicia of parental connection we could not say that B.E.L.S.'s mother had "failed to make a reasonable effort to maintain a parental relationship" with her son. But, in this alleged international abandonment case, in which the trial court determined that sole physical and legal custody should be given to B.E.L.S.'s father, the boy's mother—as a practical matter—retained only theoretical visitation rights, at least for the foreseeable future; she had no more than a diluted parental relationship—a relationship that no "reasonable effort" could make normal. The mother's sending her son away with smugglers to a foreign land, at substantial risk to his life,[30] forced a physical separation from B.E.L.S. that not even the child of an incarcerated felon would necessarily have to endure. All things considered, therefore, it is no stretch, if one is realistic, to conclude—as we do here—that a parent who sends a child off on such a journey to

---

[30] "Smuggled children embarking on the journey to the United States face considerable risks, not only from exposure to the elements and the dangers of riding atop trains, but also from gangs, smugglers, and police who frequently rob, extort, brutally attack, rape, and even sometimes kill them . . . ." *In re Amandeep S.*, No. G-1310, 2014 WL 2808690, at *13 (N.Y. Fam. Ct. June 19, 2014) (internal brackets and quotation marks omitted); *cf. W.R.A.H. v. D.M.A.H.*, No. A-4440-16T2, 2018 WL 3339801, at *3 (N.J. Super. Ct. App. Div. July 9, 2018) (parent who "deliberately allowed [her child] to flee Guatemala unaccompanied for a two month trek north" held to have "abandoned or neglected" child under New Jersey law; court cited "considerable perils potentially visited upon an unaccompanied minor [trekking] to the United States from Central America," even though the sending parent may have had the minor's "best interest in mind").

the United States has "abandoned" the child to the uncertain fate awaiting every child on such a highly dangerous passage.

Having decided that B.E.L.S.'s mother has abandoned him as a matter of law on this record, we need not review her actions under the second clause of the neglect statute quoted above.[31]

## 2. Viability of Reunification

We thus turn to the final question: whether B.E.L.S.'s reunification with his mother after a forced return to Guatemala would be "viable," a foreseeability inquiry that focuses on "the workability or practicability of a forced reunification."[32] We conclude that such return would not be viable. Although the trial court rejected B.E.L.S.'s testimony that a gang had twice threatened him after he refused to sell drugs,[33] the court did not question the boy's underlying assertion that the gang on both occasions had asked him to do so; nor did the court express

_____

[31] See text accompanying *supra* note 28.

[32] *J.U. v. J.C.P.C.*, 176 A.3d 136, 141 (D.C. 2018); see *id.* at 143 (referring to "the flexibility of the [viability] concept depending on the context for which the determination is being made").

[33] See *supra* note 9.

doubt that B.E.L.S.'s mother was motivated by gang concerns when she sent him away with smugglers within a month after the second gang request—evidence that, upon the gang's resurgence after a year's dormancy, she reasonably feared for her son's safety. It is therefore reasonable to assume that, given the mother's perception of continuing gang danger to B.E.L.S. if he were to return to Guatemala, the risk is obvious: his mother might well attempt a second, similar abandonment. We therefore conclude, in the words of the statute, that B.E.L.S.'s forced "reunification" with his mother would be "not viable."[34]

*****

For the foregoing reasons, the court's order of December 22, 2016, is vacated. We remand the case for entry of judgment forthwith granting appellant authority to petition the United States for Special Immigrant Juvenile Status for B.E.L.S. on grounds of "abandonment" pursuant to 8 U.S.C. § 1101 (a)(27)(J) (2009 Supp. II).

*Reversed and remanded.*

---

[34] See *supra* note 1.

EASTERLY, *Associate Judge*, concurring: The panel agrees that B.E.L.S.' reunification with his mother is "not viable due to abuse, neglect, abandonment, or a similar basis" and thus that he is qualified to petition for Special Immigrant Juvenile Status. 8 U.S.C. § 1101 (a)(27)(J) (2009 Supp. II). My understanding of how the District's courts should adjudicate SIJS findings is best reflected in *Benitez v. Doe*, 193 A.3d 134 (D.C. 2018); *E.P.L. v. J.L.-A.*, 190 A.3d 1002 (D.C. 2018); and *J.U. v. J.C.P.C.*, 176 A.3d 136 (D.C. 2018). Specifically, I understand that our objective is not to determine if we should "deprive a parent of custody or . . . terminate parental rights," but rather to "assess the impact of the history of the parent's past conduct on the viability, i.e., the workability or practicability of a forced reunification of parent with minor, if the minor were to be returned to the home country." 176 A.3d at 141; *see also E.P.L. v. J.L.-A.*, 190 A.3d 1002, 1007 (D.C. 2018) (explaining "the question is not whether a juvenile without legal status has been neglected or abandoned by a parent in the abstract, but rather whether reunification of that juvenile with one or both of her parents is not viable due to [neglect or] abandonment") (internal quotations and citations omitted).

FERREN, *Senior Judge*, concurring in the judgment: In three earlier proceedings, we reversed trial court decisions declining to grant SIJS on grounds of "abandonment."[1] Although I respect my colleagues' analysis, I cannot agree that these earlier decisions support reversal here. Contrary to the facts in those cases, the record before us confirms not abandonment but a continuing "parental relationship"[2] between B.E.L.S. and his mother extending from Guatemala to Washington, D.C. Nonetheless, I concur in the judgment because I believe that other statutory language compels us to rule that B.E.L.S.'s mother "neglected" her son by sending him away from home alone with human smugglers, and that under

---

[1] *See Benitez v. Doe*, 193 A.3d 134, 138 (D.C. 2018) ("The record reveals, [] that John Doe has made no effort to assume any parental responsibility for J.V.B., never participated, directly or indirectly, in her care and upbringing, and has never made himself known." (internal brackets and quotation marks omitted)); *E.P.L. v. J.L.-A.*, 190 A.3d 1002, 1007 (D.C. 2018) ("[T]he undisputed evidence established that M.L.P.'s father had left M.L.P. behind in Guatemala when she was six months old . . . and even during the pendency of the proceedings had not exercised his right to visitation to meet M.L.P. to attempt to establish a relationship with her."); *J.U. v. J.C.P.C.*, 176 A.3d 136, 142-43 (D.C. 2018) ("[T]he father, while perhaps not without affection for his son . . . never provided a home with father and son together, never exercised the day-to-day oversight with parental decisions incumbent upon proper care and supervision, . . . and essentially outsourced all these duties to others.").

[2] D.C. Code § 16-2316 (d)(1)(C) (2012 Repl.).

these circumstances a forced reunification of mother and son in Guatemala would not be "viable."[3]

## I.

Under District of Columbia law, a "neglected child" includes a child [1] "who has been abandoned or abused by his or her parent, . . . or [2] whose parent has failed to make reasonable efforts to prevent the infliction of abuse upon the child."[4] As to the first clause, there is no allegation of "abuse" here, and, given the statutory language applicable to "abandonment," I cannot conclude that B.E.L.S.'s mother has abandoned him.

A court may infer abandonment if a parent "has made no reasonable effort to maintain a parental relationship with the child for a period of at least four (4) months."[5] In this case, B.E.L.S's mother retained a "right of visitation" in her custody agreement with the boy's father and has regular Saturday phone calls with her son here in the District. Her physical relationship with B.E.L.S. has been suspended, but her head and her heart—and thus her advice and her comfort—are

---

[3] 8 U.S.C. § 1101 (a)(27)(J)(i) (2009 Supp. II), quoted *ante* at 2 note 1.

[4] D.C. Code § 16-2301 (9)(A)(i) (2012 Repl.).

[5] D.C. Code § 16-2316 (d)(1)(C).

still with him.[6]  For me, therefore, it is too great a stretch to say that she has made no reasonable "effort to maintain a parental relationship" with B.E.L.S.[7]

## II.

Absent abandonment, however, there is still a serious question under the second clause of the District's neglect statute.[8]  Did B.E.L.S.'s mother, by sending her minor son on a journey with human smugglers (creating a "substantial risk to his life"),[9] "fail[] to make reasonable efforts to prevent the infliction of abuse upon the child"?[10]  The trial court did not consider that question.[11]  In my view,

_____

[6]  Cf. *supra* note 1.

[7]  D.C. Code § 16-2316 (d)(1)(C).

[8]  See *supra* text accompanying note 4.

[9]  *Ante* at 14.

[10]  D.C. Code § 16-2301 (9)(A)(i).

[11]  The trial court limited its analysis to whether B.E.L.S. had been subject to parental abuse or neglect "*prior to* his departure from Guatemala," more specifically, "*before* his mother sent him to live with his father in the United States."  The court thus appears to believe that parental "neglect" under the SIJS statute is limited to whether a child had been abused or deprived of basic needs (food, clothing, shelter, etc.) at home in the foreign country and, if so, would be similarly treated upon a forced reunification. As a result, by limiting "neglect" to interactions within the child's immediate family—indeed, by focusing exclusively on the illness and unemployment of B.E.L.S.'s mother, and the financial support

(continued . . . )

however, a decision to entrust one's child to human smugglers (pejoratively called "coyotes")[12] presumptively creates an unreasonable risk of child abuse; it is no less neglectful than failure to provide a child with "adequate food, clothing, shelter" or other basic needs.[13]

Although the trial court entirely rejected B.E.L.S.'s testimony that he had been sent away because a gang had threatened him with harm if he would not sell drugs, I agree with my colleagues that the omission of such a finding does not conclusively negate the possibility that B.E.L.S.'s mother may well have worried about the approach of a gang, and thus had to deal with conflicting fears of a gang

_____

( . . . continued)

supplied by the boy's father—the trial court excluded any possibility that "neglect" also may have included the decision to entrust B.E.L.S.'s fate to the care of human smugglers for the long and dangerous journey to the United States (whether motivated by a gang threat or otherwise). The trial court acknowledged that, in coming to the United States, B.E.L.S. would "be distant from public safety concerns in Guatemala." But that observation was limited to the court's conclusion under subsection (ii) of the SIJS statute, see *ante* at 2 note 1, that B.E.L.S.'s "best interest" would be served by remaining in the United States, see *ante* at 6, which of course the trial court's ultimate ruling precluded.

[12] *See United States v. Calderon-Lopez*, 268 Fed. App'x 279, 282 n.3 (5th Cir. 2008) ("In the smuggling context, smugglers are generally known as 'coyotes.'"); *see also United States v. Melchor*, 360 Fed. App'x 8, 10 (11th Cir. 2010) (referring to "'coyotes' or human traffickers").

[13] D.C. Code § 4-1341.01 (3) (2012 Repl.) (adding "education" and "medical care" to the list of basic needs).

threat and a smuggler's journey.[14]  But even if the trial court had found that, yes, gang members twice approached B.E.L.S. to sell drugs, there would be no record basis for determining whether, on balance, the decision to send B.E.L.S. with smugglers, rather than risk keeping him at home (unprotected by allegedly indifferent or corrupt police), was neglectful.  B.E.L.S.'s mother did not respond to appellee's petition, let alone testify at the hearing, and thus a remand for further findings as to her motivation, straightforward or mixed, could result only in speculation.

We cannot leave the matter in equipoise, however.  In the first place, as the opinion for the court explains based on the intent of Congress, "all the relevant factors must be understood in the light most favorable to determinations of neglect and abandonment."[15]  Congress, of course, has delegated an important measure of discretion to state courts, applying SIJS as a first step toward an immigration decision.  But in an ambiguous situation as we have here in assessing "neglect," the trial court – consistent with the intent of Congress—should ordinarily make a decision favorable to the SIJS petitioner.  Such close cases should become

---

[14]  See *ante* at 15-16.

[15]  *Ante* at 13.

ultimately a federal, not a state, responsibility once a state court has entered a custody order under state law. Otherwise, when state courts apply their local law in this unique, international context, they may well impose narrow formulations of neglect and abandonment at odds with the ultimate judgments that federal immigration authorities would make if an SIJS petition had been approved for their consideration.[16]

For me, then, the focus is on the obvious danger to B.E.L.S. from a journey with human smugglers (a reasonable stretch of judicial notice that other courts have similarly taken).[17] I am persuaded that whatever the parental motivation—fear of a gang or a mere desire to launch a child toward a better life—the enlistment of human smugglers is presumptively an act of neglect under District of Columbia law. Conceivably a trial court could find that a foreign parent who hired a particular smuggler under specific circumstances had made a "reasonable effort[] to prevent the infliction of abuse upon the child."[18] But in the absence of such a showing, I will not speculate that the decision of B.E.L.S.'s mother to send him

_____

[16] See *ante* at 12.

[17] See *ante* at 14 note 30.

[18] D.C. Code § 16-2301 (9)(A)(i).

away with smugglers was reasonable enough for this court to conclude that her action was not neglectful.

## III.

Finally, having ascertained the mother's neglect, I join my colleagues in concluding that forced reunification of B.E.L.S. with his mother in Guatemala would not be viable.[19] Of course, viability of reunification is not determined simply by reference to a child's treatment as of the time he or she left the family home.[20] Viability, rather, turns on a foreseeability inquiry as to whether, at the time of SIJS adjudication, the child would be subject to abuse, neglect, abandonment, or similar treatment if reunified with a parent in the foreign country —an inquiry that focuses on "the workability or practicability of a forced reunification."[21]

---

[19] *Ante* at 15-16.

[20] *See J.U.,* 176 A.3d at 140 ("It is not the abstract question whether the minor has been neglected or abandoned by the [parent in the foreign country]. Rather it is whether reunification with the [parent in the foreign country] is [not] 'viable' due to" foreseeable abuse, neglect, or abandonment.); *see id.* at 143 ("Given the flexibility of the [viability] concept depending on the context for which the determination is being made," the court looks to "the lifelong history [of the parent-child relationship] and the bearing of that history on the prospects [of reunification] if [the minor] were to be returned to the immediate custody of the [parent] in the home country.").

[21] *Id.* at 141.

My colleagues conclude that a forced reunification of B.E.L.S. with his mother would not be viable because, "given [her] perception of continuing gang danger to B.E.L.S.[,] . . . his mother might well attempt a second, similar abandonment."[22]  Whatever his mother's motive was, it was strong enough to cause her to hire human smugglers in the first instance.  There is no reason to believe that B.E.L.S.'s mother's level of "neglect" reflects a less obvious risk of a second journey endangering B.E.L.S. in the hands of human smugglers than the same facts characterized as "abandonment."  I therefore agree with my colleagues that forced reunification of B.E.L.S. with his mother in Guatemala would be "not viable."[23]

*****

I realize that this analysis shakes down to a conclusion that enlistment of human smugglers to carry an unaccompanied child up to or across an international border amounts to neglect per se when the sending parent—who typically has no desire to oppose an SIJS petition—fails to do so.  I therefore acknowledge that no practical limiting principle exists under local law in such a case.  Nonetheless, allowing SIJS proceedings to go forward without the participation of a foreign

---

[22] *Ante* at 16.

[23] 8 U.S.C. § 1101(a)(27)(J)(i), quoted *ante* at 2 note 1.

parent, properly notified of that proceeding, is fully consistent with District law.[24]

Whether this leads to a loophole in the SIJS structure is not the concern of state courts (including ours), but rather a question for federal immigration authorities deciding SIJS petitions under federal law.[25]

For the foregoing reasons, I join the judgment of the court.

_____

[24] *See* D.C. Code §§ 16-2359 (a) (2012 Repl.) ("If the parent has been given proper notice [of a proceeding to terminate parental rights] but has failed to appear the judge may proceed in his or her absence."), -2388 (a) (2012 Repl.) ("If a parent has been given proper notice [of a permanent guardianship proceeding] but fails to appear, the court may proceed in the parent's absence."); *ante* at 9 (quoting *USCIS Policy Manual*).

[25] *See* 8 U.S.C. § 1101 (a)(27)(J)(iii), quoted *ante* at 2 note 1.